Filed 11/12/14  P. v. Martinez CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ALEJANDRO ESPINOZA MARTINEZ,<br><br>    Defendant and Appellant. | B251383<br><br>(Los Angeles County<br> Super. Ct. No. VA117160) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Raul A. Sahagun, Judge.  Affirmed in part, reversed in part and remanded.

Rodger P. Curnow, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Chung L. Mar and Erika D. Jackson, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

By information, the People charged Alejandro Espinoza Martinez and Edgar Esequiel Espinoza with the murder of Marco Reyes (§ 187, subd. (a)) and shooting at an occupied motor vehicle (§ 246).[1] The information alleged gang enhancements (§§ 186.22, subd. (b)(1)(C) & 186.22, subd. (b)(4)) and firearm enhancements (§ 12022.53, subds. (b), (c), & (d)).

The two defendants were jointly tried but, pursuant to stipulation, separate juries were empanelled for each defendant. One jury convicted Martinez of first degree murder and shooting at an occupied motor vehicle and found all enhancements to be true. The trial court sentenced him to a term of 50 years to life. The other jury could not reach a verdict on Espinoza's guilt. The court declared a mistrial and Espinoza later entered into a negotiated disposition of his case.

In this appeal, Martinez (defendant) contends primarily that the evidence is insufficient to sustain his convictions and the jury's finding on the gang enhancement. We conclude that substantial evidence supports the jury's verdicts. Secondarily, defendant urges, and the Attorney General agrees, that the matter must be remanded to the trial court because it failed to properly impose and then stay, pursuant to section 654, a portion of defendant's sentence. We remand for that limited purpose but, in all other respects, affirm the judgment.

# STATEMENT OF FACTS

1. *Factual Overview*

The crimes are gang-motivated. Defendant and Espinoza are brothers, Espinoza being the older. Each is a member of the 51st Street gang. On October

---

[1] All undesignated statutory references are to the Penal Code.

2

11, 2010, the two men participated in the murder of Marco Reyes. Defendant was the shooter and Espinoza was the getaway driver. Reyes, the murder victim, was a member of a rival gang, the Bratz gang. Defendant and Espinoza committed the murder to retaliate for an assault committed the previous month when Bratz gang members shot at defendant and other members of the 51st Street gang in front of defendant's home.

## 2. *The September 2010 Shooting*

Defendant's home is located in territory claimed by the 51st Street gang. During the evening of September 5, 2010, defendant, Bryant Ocampo and Ivan Espinoza were standing in front of defendant's home.[2] All three men are members of the 51st Street gang. A four-door white car, which had its lights turned off, sped by. Shots were fired at the three men from the vehicle. Ivan Espinoza was hit in the head but survived. The car quickly drove away. The white car resembled Reyes' vehicle.

## 3. *Reyes' Murder*

During the afternoon of October 11, 2010, Reyes was with Ana Mireles when his car broke down near the intersection of State Street and Florence in Huntington Park. Reyes stayed in the car while Mireles walked to buy oil. As Mireles was returning to the car, she heard gunshots and then saw a man running away from Reyes' car.

Juan Alarcon witnessed the shooting. He was driving by the intersection of State Street and Florence when he heard multiple gunshots. Alarcon saw a man

---

[2] The record does not indicate whether Ivan Espinoza is related to codefendant Espinoza or defendant. For purposes of clarity, we will refer to the codefendant as Espinoza and to Ivan Espinoza by his full name.

3

shoot Reyes as Reyes sat in his car. The shooter ran north and entered the passenger side of a Hyundai. The Hyundai's driver was "slightly older" than the shooter. Alarcon telephoned 911 and reported what he had seen, including the Hyundai's license plate number.

At trial, Alarcon was shown a six-person photo show-up. Defendant is at position 2 in the show-up. Alarcon testified that he was "twenty percent" sure that "the man in picture number 2" was the shooter. Alarcon also testified that both defendant and Espinoza looked similar to the shooter but he was unsure which one was the shooter.

4. *The Police Investigation*

Shortly after the shooting, the police saw a Hyundai in a parking lot that matched the description given by Alarcon.[3] Within minutes, Espinoza and Ocampo returned to the car. Espinoza looked around nervously and entered the driver's side. The men drove off but soon the police stopped the vehicle. Espinoza and Ocampo were transported to the police station where a gunshot residue test was conducted on each man. Espinoza's test was positive and Ocampo's test was negative.

The police recovered Ocampo's cell phone from the Hyundai. The phone logs showed that Alfredo Rivera had been called immediately before and after Reyes had been shot. Rivera is a member of the 51st Street gang. As set forth below, four months later the police located and interviewed Rivera.

The police found several .380 bullet cartridge casings in Reyes' car. A photograph found on Ocampo's phone, date stamped October 11, showed Ocampo

---

[3]     The police subsequently determined that the Hyundai belonged to Espinoza.

4

holding a handgun that fires .380 caliber bullets.  The police did not recover the murder weapon.

5. *Rivera's Statements to the Police*

In a videotaped interview conducted in February 2011, Rivera essentially told the police that defendant had told him that he (defendant) had shot Reyes to retaliate for the September 2010 shooting.

Rivera explained that around 2 p.m. on October 11, 2010 (the day of the shooting), defendant telephoned him and asked him to come over.  Rivera picked defendant up at his house and the two men drove off.  During their drive, defendant received a call on his cell phone after which he said:  "Oh, man.  They just got my brother [Espinoza]. . . .  They just got my brother [and] Bryant [Ocampo]."  According to Rivera, defendant said "that over there on Florence and State," he "just shot at somebody. . . .  [¶]  I just got into a shootout."  Defendant had gone to the area with Espinoza and Ocampo in a Hyundai.

Defendant explained to Rivera that on another day, he had had been outside his home when "some guys pull up and start shooting. . . .  [Ivan Espinoza] got hit in the head. . . .  Boom."  Defendant told Rivera that was why he "lit some fools up right there . . . on Florence and State."  Defendant said that he used a "small gun" that took .380 caliber shells and that he had hidden the gun in a tool shed.

The prosecution called Rivera as a witness at trial.  Rivera either refused to answer any questions or testified he could not recall having made any statements in the February 2011 interview.  Rivera was similarly evasive when cross-examined by defense counsel.  The trial court ruled that the People could introduce evidence of Rivera's February 2011 interview under the prior inconsistent statement

5

exception to the hearsay rule.[4]  (Evid. Code, § 1235.)[5],[6]  In this appeal, defendant does not challenge that ruling.

6. *Expert Gang Testimony*

Officer Marko Mendoza testified as a gang expert.  He received training as a gang expert first at the Los Angeles County Sheriff's Academy and then at the Huntington Park police department.  He worked in the gang division of the City of Huntington Park police department for a year and a half where, "partnered up with other seasoned detectives, [he] learned . . . how to investigate gang crimes."  He interviewed more than 50 gang members and believed that these interviews constituted valuable sources of information.  Prior to defendant's trial, Officer Mendoza qualified twice as an expert on the 51st Street gang.

Officer Mendoza testified that the 51st Street gang originated in the nearby Pueblos Housing Project in the City of Los Angeles.  The gang started its activity in Huntington Park in 2010 with "about" three or four members when several

---

[4]  The videotape of the interview was played for the jury and a transcript of the interview was distributed to them.

[5]  In determining whether the prior inconsistent statement exception applies, "'[i]nconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness' prior statement [citation], and the same principle governs the case of the forgetful witness.'  [Citation.]  When a witness's claim of lack of memory amounts to deliberate evasion,  inconsistency is implied.  [Citation.]  As long as there is a reasonable basis in the record for concluding that the witness's 'I don't remember' statements are evasive and untruthful, admission of his or her prior statements is proper.  [Citation.]" (*People v. Johnson* (1992) 3 Cal.4th 1183, 1219-1220.)  "Similarly, under the circumstances of a particular case, a witness's refusal to answer may be materially inconsistent with prior statements, exposing the witness to impeachment under Evidence Code section 1235.  [Citation.]"  (*People v. Homick* (2012) 55 Cal.4th 816, 859.)

[6]  Defendant's statements to Rivera fell, of course, within the admission exception to the hearsay rule.  (Evid. Code, § 1220.)

6

members of the Los Angeles gang moved to Huntington Park. The gang's primary activities included assault with a deadly weapon, possession of a firearm and vandalism. It committed vandalism, including tagging, to "let[] other people know they're in that area." The gang claimed the street where defendant lived, "the 6400 block at Benson," as its territory and used vandalism to mark the area as belonging to it.

In September 2010, Ivan Espinoza had been shot while standing in front of defendant's home with defendant and Ocampo. When a gang member is shot (in this case, Ivan Espinoza), his gang will retaliate by taking action.

The 51st Street gang was at "war" with the Bratz gang which had approximately 15 to 20 members. The two gangs were engaged in "a pretty active war" in September and October 2010. Reyes, the murder victim, was a member of the Bratz gang.

In Officer Mendoza's opinion, defendant was a member of the 51st Street gang. The officer based his opinion upon information that he had learned during prior investigations as well as the fact that defendant had admitted to another officer that he was a member of the 51st Street gang. Similarly, Officer Mendoza opined that Espinoza was a member of the 51st Street gang based on information he had received from other officers investigating this case. In addition, Officer Mendoza testified that both defendant and Ocampo have a "51" tattoo which signified membership in the 51st Street gang.

To establish commission of the predicate offenses, Officer Mendoza testified that Rivera (the individual whose interview with the police had been introduced into evidence) was a member of the 51st Street gang and had been convicted of attempted robbery, and that Angel Martinez (the brother of both defendants) was a member of the 51st Street gang and had been convicted of possession of a firearm.

7

Officer Mendoza was presented with a hypothetical question that included the following facts. Three gang members are in a car. One gang member leaves the car. In broad daylight, he approaches and shoots a member of an enemy gang. The shooter returns to the car and the three men leave. Given those facts, Officer Mendoza opined that the shooting was committed for, to benefit, and in association with the gang to which the three men belonged. He explained that committing the shooting in broad daylight indicates "pretty much you don't care if you're being seen by somebody else. . . . You're walking up to an enemy gang member shooting that person and then running back and not [being] afraid if somebody witnessed you . . . or if someone's calling the police."

## DISCUSSION

A. *Sufficiency of the Evidence to Sustain the Convictions*

First, defendant contends that the evidence is insufficient to sustain his convictions for the murder of Reyes and shooting at an occupied motor vehicle. We disagree.

In *People v. Boyer* (2006) 38 Cal.4th 412, the California Supreme Court set forth the applicable standard of review: "On appeal, the test of legal sufficiency is whether there is substantial evidence, i.e., evidence from which a reasonable trier of fact could conclude that the prosecution sustained its burden of proof beyond a reasonable doubt. [Citations.] Evidence meeting this standard satisfies constitutional due process and reliability concerns. [Citations.] [¶] While the appellate court must determine that the supporting evidence is reasonable, inherently credible, and of solid value, the court must review the evidence in the light most favorable to the prosecution, and must presume every fact the jury could reasonably have deduced from the evidence. [Citations.] Issues of witness credibility are for the jury. [Citations.]" (*Id*. at pp. 479-480.)

8

We conclude that the prosecution provided substantial evidence of defendant's guilt beyond a reasonable doubt for the following reasons.

First, Rivera's videotaped February 2011 interview with the police set forth the salient facts. During the afternoon of October 11, 2010, defendant telephoned Rivera and asked him to come to his house. Rivera drove to the house. Pursuant to defendant's request, the two men took a drive. During that time, defendant received a phone call after which he told Rivera that the police had taken Espinoza and Ocampo into custody. Defendant explained that earlier that day, he, Espinoza and Ocampo had been in the area of Florence and State, having driven there in a Hyundai. At that location, he (defendant) shot someone with a small gun using .380 caliber bullets. Defendant told Rivera that he had committed the murder to retaliate for the shooting the prior month that had injured Ivan Espinoza.

The issue for the jury was whether Rivera was telling the truth when he told the police that defendant had made those admissions to him. In that regard, the jurors had two opportunities to view Rivera's demeanor and evaluate his credibility. The first was when the prosecution called him as a witness and he refused to answer questions, gave evasive answers, or claimed that he had no recollection of the subject matter of the question(s) asked. The second opportunity was when they watched the videotape of his interview, a videotape whose authenticity the defense never questioned. These two instances gave the jury ample opportunity to evaluate Rivera's credibility and to decide in which instance Rivera was telling the truth: was it when he told the police about defendant's admissions or was it when he testified in court and essentially denied having made those statements to the police?

In closing argument, both the prosecutor and defense counsel thoroughly explored the issue of Rivera's credibility. During deliberations, the jury asked to again view the videotape of Rivera's interview. The trial court granted the request

9

and permitted the jurors to review a transcript of the interview as the videotape was played. By convicting defendant, the jury implicitly found that Rivera was telling the truth when, in the course of that interview, he told the police about defendant's admissions. We will not disturb that credibility determination. (*In re Daniel G.* (2004) 120 Cal.App.4th 824, 830.) Consequently, when defendant's statements to Rivera are viewed, as is required, in the light most favorable to the judgment (*People v. Steele* (2002) 27 Cal.4th 1230, 1249), they are tantamount to a confession that defendant shot Reyes to retaliate for the Bratz gang's shooting the prior month in front of his house in which Ivan Espinoza had been injured.

Second, additional evidence corroborated that Rivera was telling the truth when he repeated defendant's admissions to the police. Defendant told Rivera that he had shot the victim: Alarcon, who witnessed the shooting, identified, albeit equivocally ("twenty percent" sure), defendant as the shooter. Defendant told Rivera that he had used a gun that took .380 caliber bullets: .380 bullet casings were found in Reyes' car. And defendant told Rivera that he went to the intersection of Florence and State in a Hyundai with Espinoza and Ocampo: Reyes was murdered at that intersection; Alarcon saw the shooter enter a Hyundai; and Espinoza and Ocampo were apprehended shortly after the shooting in Espinoza's Hyundai.

Third, Officer Mendoza's testimony as a gang expert corroborated defendant's guilt because it supplied a context in which the jury could evaluate the evidence. In particular, Officer Mendoza explained that the shooter (here, defendant) and the victim (here, Reyes) were members of rival gangs that were at war with each other. The prior month there had been a drive-by shooting in front of defendant's home in which one of his fellow gang members (Ivan Espinoza) had been shot. Typically, a gang such as defendant's will retaliate for such a shooting

10

through violence. In sum, Officer Mendoza's testimony explained the "why" of the shooting, an explanation that inferentially pointed towards defendant's guilt.

Therefore, viewing the evidence in the light most favorable to the judgment, we conclude substantial evidence supports defendant's convictions.

To reach a contrary conclusion, defendant argues that "the only evidence that [he] was the shooter was derived from [Rivera's] unsworn prior inconsistent statements" and that such evidence "is insufficient as a matter of law." Defendant is wrong on the facts and wrong on the law. As explained above, Rivera's statements repeating defendant's admissions do not constitute the only evidence establishing defendant's guilt. In any event, as we explain below, defendant's claim that prior inconsistent statements cannot, by themselves, constitute substantial evidence to sustain a conviction is incorrect. (*People v. Brown* (1984) 150 Cal.App.3d 968, 972-973 [prior inconsistent statements can constitute substantial evidence to sustain a conviction].)

First, defendant cites *In re Miguel L.* (1982) 32 Cal.3d 100, 105-107, for the proposition that the California Supreme Court has "adopted a per se rule that a prior inconsistent statement, recanted at trial, is alone insufficient to support a conviction." Defendant's reliance on *In re Miguel* is misplaced for two reasons.

First, *In re Miguel L., supra*, 32 Cal.3d 100 is factually distinguishable. The case held that a self-declared accomplice's recanted extrajudicial statements incriminating the defendant were insufficient by themselves to prove that the defendant had committed the charged offense. (*Id.* at pp. 104-110.) The court reasoned, in part, that the statements "as accomplice evidence, . . . come from a 'tainted source.' [Citation.]" (*Id.* at p. 110.) But in this case, defendant has never urged, and on this record could not urge, that Rivera was an accomplice to Reyes' murder.

11

Second, and more importantly, *In re Miguel L.* relied upon precedent that has since been overruled. *In re Miguel L.* anchored its conclusion to *People v. Gould* (1960) 54 Cal.2d 621 (*Gould*) which had held that "[a]n extrajudicial identification that cannot be confirmed by an identification at the trial is insufficient to sustain a conviction in the absence of other evidence tending to connect the defendant with the crime." (*Id*. at p. 631.) However, the California Supreme Court explicitly overruled *Gould's* corroboration requirement in *People v. Cuevas* (1995) 12 Cal.4th 252, holding that "the sufficiency of an out-of-court identification to support a conviction should be determined under the substantial evidence test . . . that is used to determine the sufficiency of other forms of evidence to support a conviction." (*Id*. at p. 257.) By a parity of reasoning, the sufficiency of out-of-court prior inconsistent statements to sustain a conviction should likewise be determined under the substantial evidence test. (See *People v. Williams* (1997) 16 Cal.4th 153, 248.) And, as we have explained above in detail, substantial evidence supports defendant's convictions.

Next, defendant cites two decisions from the United States Supreme Court to support his contention that prior inconsistent statements are, by themselves, insufficient to support a criminal conviction. Neither decision is apposite.

The first is *Bridges v. Wixon* (1945) 326 U.S. 135 (*Bridges*). There, the court reversed a deportation order that was based on a witness's prior inconsistent statements that had been admitted as substantive evidence. The court found that the use of the statements as substantive evidence was a clear violation of the rules governing deportation proceedings. (*Id*. at pp. 149-153.) On that basis, *Bridges* is clearly distinguishable because Evidence Code section 1235 specifically authorizes the use of prior inconsistent statements as substantive evidence. Defendant, nonetheless, relies upon the following observation that *Bridges* made in reaching its conclusion: "The statements which [the witness] allegedly made were hearsay.

12

We may assume they would be admissible for purposes of impeachment. But they certainly would not be admissible in any criminal case as substantive evidence. [Citations.] So to hold would allow men to be convicted on unsworn testimony of witnesses–a practice which runs counter to the notions of fairness on which our legal system is founded." (*Id*. at pp. 153-154, fn. omitted.) These comments, rendered decades before Congress and the California Legislature authorized the use of a witness' prior inconsistent statement as substantive evidence through enactment, respectively, of the Federal Rules of Evidence, rule 801(d)(1)(A) and Evidence Code section 1235, cannot and do not support the claim that the use of Rivera's prior inconsistent statements renders defendant's convictions constitutionally deficient. (See *People v. Green* (1971) 3 Cal.3d 981 [Evidence Code section 1235 does not violate the confrontation clause of either the state or federal constitution].)

The second decision defendant cites is *Tome v. United States* (1995) 513 U.S. 150 (*Tome*). In *Tome,* the defendant was charged with sexually abusing his four-year-old daughter. Defendant and his wife were divorced. (*Id*. at p. 153.) The sexual abuse allegedly occurred while defendant had primary custody of his daughter. (*Ibid*.) At trial, the victim testified as a prosecution witness. Defense counsel's cross-examination suggested that her testimony implicating her father was motivated by a desire to live with her mother instead of her father. (*Id*. at p. 154.) After the victim completed her testimony, the prosecution, over defense objection, called six witnesses to testify to statements the victim had made that were consistent with her claim of sexual abuse. (*Ibid*.) All of the victim's statements, however, had been made *after* her alleged motive to fabricate arose. (*Id*. at p. 156.) To avoid the hearsay problem created by using the statements as substantive evidence, the trial court found that they came within the prior

consistent statement exclusion to the hearsay rule. (Fed. Rules of Evidence, rule 801(d)(1)(B).)[7]

On appeal, the defendant contended that the prior consistent statements were improperly admitted as substantive proof because they were made after the victim's motive to fabricate arose. The federal appellate court affirmed his conviction, noting that the circuit courts were in conflict as to whether a prior consistent statement had to have been made prior to the point in time when the motive to fabricate arose before it could be admitted under the Federal rule. (*Tome, supra*, 513 U.S. at p. 155.)

The United States Supreme Court granted certiorari to resolve the conflict of authority. It held that Federal Rules of Evidence, rule 801(d)(1)(B) embodied the common law requirement "that the consistent statements must have been made before the alleged influence, or motive to fabricate, arose" before the statements could be offered as proof. (*Tome, supra,* 513 U.S. at p. 158.) It reasoned: "If [rule 801(d)(1)(B) of the Federal Rules of Evidence] were to permit the introduction of prior statements as substantive evidence to rebut every implicit charge that a witness' in-court testimony results from a recent fabrication or improper influence or motive, the whole emphasis of the trial could shift to the out-of-court statements, not the in-court ones." (*Id.* at p. 165.) Contrary to what defendant argues, that observation does not support his argument that *his conviction* is not supported by substantial evidence. As *Tome* explained, "[o]ur holding is confined to the requirements for admission under Rule 801(d)(1)(B). . . . [The] conditions

---

**7** Federal Rules of Evidence, rule 801(d) provides, in relevant part: "A statement that meets the following conditions is not hearsay: [¶] (1) The declarant testifies and is subject to cross-examination about a prior statement, and the statement: . . . [¶] (B) is consistent with the declarant's testimony and is offered to rebut an express or implied charge that the declarant recently fabricated it."

of admissibility were not established here." (*Id*. at p. 167.)  Here, on the other hand, defendant does not challenge the trial court's finding that the foundational requirements to admitting Rivera's prior inconsistent statements as substantive evidence pursuant to Evidence Code section 1235 had been met.

Lastly, defendant cites decisions from other states or intermediate federal courts for the proposition that prior inconsistent statements are insufficient as a matter of law to sustain a conviction.  There is no reason to discuss those cases.  As explained earlier, California decisional law does not provide for such an absolute rule and, in any event, defendant's convictions are supported by more than Rivera's prior inconsistent statements.

B.  *Sufficiency of the Evidence to Sustain the Gang Enhancement*

Defendant's second contention is that the evidence is insufficient to sustain the jury's finding on the gang enhancement.[8]  In particular, he argues that there is insufficient evidence to show that the 51st Street gang was a criminal street gang and that Reyes' murder was committed to benefit the 51st Street gang.  We disagree.

1.  *Substantial Evidence Supports the Jury's Finding that the 51st Street Gang Is a Criminal Street Gang*

Gang enhancements are statutory.  Section 186.22, subdivision (b)(1) provides:  "[A]ny person who is convicted of a felony committed for the benefit of, at the direction of, or in association with *any criminal street gang*, with the specific intent to promote, further, or assist in any criminal conduct by gang members"

---

[8]    Although the jury found the gang enhancement true as to both crimes, defendant argues only that the evidence is insufficient to sustain the finding in regard to the murder conviction.

shall suffer added punishment. (Italics added.) Subdivision (f) of section 186.22 defines a criminal street gang as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its *primary activities* the commission of one or more of the criminal acts enumerated in . . . subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (Italics added.)

The substantial evidence standard governs appellate review of a jury's finding on a gang enhancement. (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1224.) An expert witness' testimony can constitute substantial evidence establishing a gang's primary activities. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 324.) And a gang expert "may rely upon conversations with gang members, on his or her personal investigations of gang-related crimes, and on information obtained from colleagues and other law enforcement agencies." (*People v. Hill* (2011) 191 Cal.App.4th 1104, 1121-1122.)

In this case, Officer Mendoza had received training as a gang expert from two law enforcement agencies: the Los Angeles County Sheriff and the Huntington Park Police. He had worked in the gang division of the Huntington Park police department for a year and a half. During that time he investigated crimes such as possession of a firearm, assault with a deadly weapon and vandalism that involved members of the 51st Street gang. Further, as part of his work as a gang officer, he had interviewed more than 50 gang members. Based upon that background, Officer Mendoza—who had previously qualified as an expert on the 51st Street gang—testified that the 51st Street gang's primary activities included assault with a deadly weapon, possession of a firearm and vandalism. These crimes are among those enumerated in section 186.22, subdivision (e). (§ 186.22, subd. (e)(1) [assault with a deadly weapon], (e)(31)

16

[possession of a firearm], & (e)(20) [vandalism].) Officer Mendoza's testimony therefore constitutes substantial evidence of the 51st Street gang's primary activities, activities that established it was a criminal street gang within the meaning of section 186.22.[9] (*People v. Margarejo* (2008) 162 Cal.App.4th 102, 108 [expert's testimony that the gang's primary activities included murder constituted substantial evidence to support the jury's finding that the gang in question met the statutory criteria].)

Defendant advances two arguments to support his claim that the prosecution failed to prove that the 51st Street gang's "primary activities were those required of a criminal street gang." Neither argument is persuasive.

First, defendant relies on *In re Alexander L.* (2007) 149 Cal.App.4th 605 to claim that Officer Mendoza's testimony came "'from highly unreliable sources' providing 'no credible data upon which the officer [could] base his opinion.'" Defendant's reliance upon *Alexander L.* is misplaced. There, the expert did not "directly" testify that the primary activities of the gang consisted of the crimes enumerated in section 186.22, subdivision (e), and the expert did not establish an adequate foundation for his testimony. (*Id.* at pp. 611-612.) Here, in contrast, Officer Mendoza, who had investigated crimes involving the 51st Street gang, directly testified about the gang's primary activities. In addition, as set forth above, an adequate foundation was established for his testimony.[10] (See, e.g.,

---

[9] The jury was instructed, among other points, that the People were required to prove beyond a reasonable doubt that the 51st Street gang is a criminal street gang that "has, as one or more of its primary activities, the commission of assaults, vandalism, possession of firearms." (CALCRIM No. 1401.)

[10] To the extent that defendant believes that an adequate foundation had not been laid for Officer Mendoza's testimony about the 51st Street gang's primary activities, the claim has been forfeited on appeal because trial counsel never objected—either during the voir dire of the officer or at the close of the officer's testimony—that his testimony

17

*People v. Duran* (2002) 97 Cal.App.4th 1448, 1465 ["The testimony of a gang expert, founded on his or her conversations with gang members, personal investigation of crimes committed by gang members, and information obtained from colleagues in . . . law enforcement agencies, may be sufficient to prove a gang's primary activities."].)

Defendant next argues that a portion of Officer Mendoza's testimony must be disregarded because it "was adduced on voir dire where [his] credentials [as an expert] were being examined." This argument overlooks two important facts. The first is that the voir dire was conducted in the jury's presence. The second is that defendant's trial counsel stated he "wish[ed] to do it [the voir dire examination] in front of the jury." Thus, the jury could properly consider the testimony elicited during voir dire in rendering its decision.[11]

2. *Substantial Evidence Supports the Jury's Finding that the Murder Was Committed to Benefit a Street Gang*

Expert testimony can establish that a crime was committed to benefit a street gang. (*People v. Albillar* (2010) 51 Cal.4th 47, 63, and cases cited therein.) A defendant's commission of a crime in concert with known gang members is substantial evidence that he acted with the specific intent to promote, further, or

_____

lacked foundation. (Evid. Code, § 353, subd. (a); *People v. Seaton* (2001) 26 Cal.4th 598, 642-643; and *People v. Campbell* (1965) 233 Cal.App.2d 38, 47-48.)

[11] CALCRIM No. 332 instructed the jury, in relevant part: "In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. You must decide whether information on which the expert relied was true and accurate. You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence."

assist the gang in committing the crime. (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 322.) And "[a] gang expert may render an opinion that facts assumed to be true in a hypothetical question present a 'classic' example of gang-related activity, so long as the hypothetical is rooted in facts shown by the evidence." (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1551, fn. 4; see also *People v. Vang* (2011) 52 Cal.4th 1038, 1049 [a gang expert may give an opinion that a crime committed in the manner described in a hypothetical question would be gang related, but may not give an opinion as to how the jury should decide the defendant's case].)

Here, defendant, codefendant Espinoza and Ocampo were members of the 51st Street gang. Reyes was a member of the rival Bratz gang. The two gangs were enemies and were engaged in an active war when Reyes was murdered. A month before Reyes' murder, shots were fired from Reyes' car at defendant and two of his fellow gang members as they stood in front of defendant's home, known 51st Street gang territory. Defendant told Rivera that he had shot Reyes in retaliation for that shooting. In addition, Officer Mendoza testified about the dynamics of enemy gang interactions and how shooting a member of the enemy gang benefits the gang. Lastly, responding to a hypothetical question based upon the facts of this case, Officer Mendoza opined that the hypothetical shooting was carried out to benefit the gang. Taken together, this constitutes substantial evidence to support the jury's finding that defendant murdered Reyes to benefit the 51st Street gang.

To support a contrary conclusion, defendant urges that the "prosecution's evidence was insufficient to prove that this shooting was other than a personal matter." He argues this must be so because the "shooting occurred not in gang territory. No one shouted any gang affiliation name. No one wore gang clothes. No one flashed gang signs or displayed gang tattoos for others to see." We are not

19

persuaded. Defense counsel made this very argument to the jury. The jury implicitly rejected it when it found the gang enhancement to be true. Consequently, defendant is asking us to reweigh the evidence, something we cannot do. (*People v. Albillar, supra,* 51 Cal.4th at p. 60.) That the facts and circumstances could also reasonably support a contrary finding does not require reversal of the jury's finding. (*People v. Millwee* (1988) 18 Cal.4th 96, 132.)

C. *Sentencing*

At the sentencing hearing, the court imposed a total sentence of 50 years to life: 25 years to life for the murder conviction and 25 years to life for the firearm use enhancement (§ 12022.53, subd. (d).). As for the conviction for shooting at an occupied motor vehicle, the court stated: "[I] will stay sentence on that pursuant to [section] 654."

Defendant contends, and the Attorney General agrees, that the trial court erred in staying the sentence on the second count. "[W]hen a [trial] court determines that a conviction falls within the meaning of section 654, it is necessary [first] to *impose* sentence but [then] to stay the *execution* of the duplicative sentence . . . pending completion of service of sentence upon the greater offense, with the stay to become permanent upon completion of that sentence. [Citations.]" (*People v. Duff* (2010) 50 Cal.4th 787, 796.)

We therefore remand the matter to the trial court to impose and stay sentence on count two pursuant to section 654 and thereafter to forward an amended abstract of judgment to the Department of Corrections and Rehabilitation.

**DISPOSITION**

The judgment is reversed for the sole purpose of remanding the matter to the trial court so that it may sentence defendant on count 2 in accord with the views expressed herein.  In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, J.

We concur:

EPSTEIN, P. J.

MANELLA, J.

21